**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| **ex rel. BOBBY SIMS,** | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **07 C 4129** |
| | ) | |
| **DONALD HULICK,** | ) | |
| **Respondent.** | ) | |

**<u>MEMORANDUM AND ORDER</u>**

Petitioner Bobby Sims' pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is before the court. For the following reasons, Sims' petition is denied.

**I.      Background**

The court will begin by summarizing this case's procedural posture, and then will recap the facts which are relevant to Sims' § 2254 petition.

**A.      Procedural Posture**

Petitioner Bobby Sims (prisoner #A63742) is incarcerated at the Menard Correctional Center in Menard, Illinois, where he is in the custody of the warden of that facility, Donald Hulick.

**1.      Direct Proceedings**

On January 13, 1992, following a jury trial in the Circuit Court of Cook County, Sims was convicted of two counts of first degree murder, two counts of armed robbery, two counts of home invasion, and one count of residential burglary. The trial court sentenced Sims to death on July 15, 1992.

Sims appealed his judgment of conviction directly to the Supreme Court of Illinois pursuant to Illinois Supreme Court Rule 603. Sims raised numerous claims, including that: (1) he had been arrested without probable cause; (2) he was denied due process of law when the trial court prevented him from fully explaining the circumstances surrounding his written confession to the jury; and (3) he was denied due process of law when the trial court failed to order a mistrial based on the State's discovery violations.

On September 21, 1995, the Supreme Court of Illinois vacated one of the home invasion convictions, but otherwise affirmed Sims' conviction and sentence. The Supreme Court of Illinois denied rehearing on December 4, 1995, and the Supreme Court of the United States denied Sims' petition for a writ of certiorari on April 29, 1996.

## 2. State Post-Conviction Proceedings

On July 17, 1995, Sims filed a pro se state post-conviction petition, which was dismissed shortly thereafter on July 31, 1995. Sims appealed, and on March 20, 1996, the Supreme Court of Illinois entered a supervisory order directing the trial court to vacate the judgment of dismissal and to provide Sims with counsel. Sims, through counsel, filed a supplemental post-conviction petition on August 14, 1998, raising additional claims. He also filed a pro se supplemental petition that included other claims.

On June 12, 2000, the trial court denied Sims' post-conviction petition. As he was then under a death sentence, Sims appealed directly to the Supreme Court of Illinois. In 2003, while his appeal was pending, then Illinois Governor George H. Ryan, Sr. commuted Sims' death sentence to a sentence of natural life imprisonment. In light of the commutation, the Supreme Court of Illinois reassigned the appeal to the Illinois Appellate Court. On November 7, 2003, the

Illinois Appellate Court vacated the trial court's judgment as to one of Sims' claims and specified that Sims was entitled to an evidentiary hearing on that issue, but otherwise affirmed the judgment dismissing the post-conviction petition.

On remand, after engaging in discovery and receiving an evidentiary hearing, the trial court denied relief as to the remanded claim. Sims appealed again, counsel was permitted to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and the Illinois Appellate Court affirmed the trial court's judgment on July 21, 2006. Sims did not file a petition for leave to appeal ("PLA") with the Supreme Court of Illinois.

### 3. § 2254 Petition

On July 18, 2007, Sims placed his petition for a writ of habeas corpus into the Department of Correction's legal mail system and his envelope was postmarked on that same day. On July 23, 2007, this court docketed Sims' § 2254 petition. The petition raises five claims. Three claims were included at all levels of his direct proceedings: (1) Sims was arrested without probable cause; (2) Sims was denied due process of law when the trial court prevented him from fully explaining the circumstances surrounding his written confession to the jury; and (3) Sims was denied due process of law when the trial court failed to order a mistrial based on the State's discovery violations. Claims four and five were presented as part of Sims' state post-conviction proceedings, which were not appealed to the Illinois Supreme Court: (4) Sims received ineffective assistance of counsel on direct appeal because his attorney failed to argue that his confession was involuntary and thus should have been suppressed; and (5) the State improperly relied on the coerced testimony of James Jackson at trial.

## B.    Facts

The court will presume that the state court's factual determinations are correct for the purposes of habeas review as Sims does not challenge those facts and, in any event, has not provided clear and convincing evidence to the contrary.  *See* 28 U.S.C. § 2254(e)(1); *Todd v. Schomig*, 283 F.3d 842, 846 (7th Cir. 2002).  The court thus adopts the state court's recitation of the facts.  *See People v. Sims*, 167 Ill.2d 483 (Ill. 1995) (direct appeal); *People v. Sims*, No. 1-03-1132 (1st Dist. Nov. 7, 2003) (unpublished order) (post-conviction appeal); *People v. Sims*, No. 1-04-3429 (Jul. 21, 2006) (unpublished order) (post-conviction appeal after evidentiary hearing).

The bodies of William Brown and Robert Nelson, who lived in neighboring apartments in Chicago, were found in Nelson's apartment on November 21, 1998.  Brown died from multiple stab wounds and Nelson died from blunt trauma and a stab wound to the chest.  Nelson's apartment had been ransacked, and some items had been taken.

Nelson was last seen alive by his son, Randall Williams, the previous morning. Williams went to his father's apartment on the evening of November 20th but no one appeared to be there. The next day, Williams returned to the apartment, looked through a back window, and saw a dead body.  Williams and his aunt alerted the police about this grim discovery.  When officers arrived, they broke down the apartment door and discovered Brown and Nelson's bodies.

After searching the apartment for fingerprints and other clues, the police focused on three objects on the kitchen table:  a large grapefruit juice bottle, a wine cooler bottle, and a drinking glass.  Nelson's fingerprints were on the wine cooler bottle and drinking glass, and Sims' fingerprints were on the grapefruit juice bottle.  Witnesses at trial included Josie Ivy (Sims' girlfriend), Lee Ivy (Josie Ivy's brother), James Jackson (Sims' nephew), Chicago police detectives Vucko and Boock, Assistant State's Attorney Robert Chapman Buckley, Jr. (who

interviewed Sims after his arrest), Sims, Eloise Cole (Sims' sister), Howard Hradek (a paramedic supervisor at Cermak Hospital, where Sims was treated after his arrest), and Randall Williams (victim Robert Nelson's son).

### 1. Josie Ivy

Josie Ivy testified that on the day of the murders, Sims left her apartment around 5 p.m., accompanied by Tony Bey. Sims returned to Josie's apartment later that evening at approximately 9 or 10 p.m. Upon his return, Sims told Josie that Bey "had hurt some people." He also repeatedly told her that he had knocked someone out with a brick while Bey had stabbed a second man, and that Bey went over to the man whom Sims had knocked out and stabbed him to "finish the job." In addition, Sims told her that Bey had given him a VCR taken from the apartment where the two men had been killed. Pursuant to Sims' instructions, Josie called her brother, Lee, and arranged for him to take the VCR. When Lee arrived at Josie's apartment to retrieve the VCR, Sims gave Lee two BB guns.

According to Josie, two days later, on November 23, 1988, she went accompanied Sims and her brother to the home of Sims' nephew, James Jackson. Sims asked Jackson if the police had been looking for him. Jackson responded by asking Sims what had happened, and Sims told him, "It's in the papers; read the paper." Sims then told Jackson that two men had been stabbed and one of these men had first been struck by a brick. He also stated that his fingerprints might be on a bottle in the apartment. Sims appeared nervous and said that he wanted to leave town.

### 2. James Jackson & Lee Ivy

Lee Ivy and James Jackson also testified about the events at Jackson's home on November 23, 1998. Like Josie, Jackson stated that Sims came to his house on November 23, 1988, and that Sims told him that he might be in trouble because some people may have been

killed at a house on 12th Place in Chicago. According to Jackson, Sims also said that the people had been stabbed, that a brick had been used, that his fingerprints might be found on a bottle in the apartment, and that the police were looking for him. Jackson also testified that Sims told him that the incident "may be in the paper" and suggested that Jackson "buy a paper."

Next, Lee Ivy testified about his encounter with Sims and Josie on November 23, 1988. Lee stated that when he arrived at Josie's apartment, Sims looked nervous and said that he wanted to leave town. Lee's testimony regarding Sims' offer of BB guns and a VCR was substantially similar to the account given by Josie. Lee also gave substantially similar testimony regarding their trip to Jackson's home and Sims' demeanor and statements while there.

### 3. Sims' Confession

Detective Ralph Vucko of the Chicago police department testified that Sims was arrested on December 21, 1988, transported to the police station, and placed in an interview room. According to Vucko, Sims was not handcuffed while he was held in the interview room. Vucko advised Sims of his Miranda rights and Sims agreed to speak to the police. Initially, Sims denied that he was involved in the incident. However, after Vucko told him that the police had spoken with Tony Bey, Rodney Ivy, Josie Ivy, and James Jackson, Sims acknowledged that he was lying and said he would tell Vucko what had happened on the night of the murders.

Vucko testified that Sims told him that he was at Josie's apartment when Tony Bey came over. Bey said he needed money and suggested that they go over to Robert Nelson's apartment. As they were walking there, they were joined by Rodney Ivy. When the three men arrived at Nelson's apartment building, Rodney Ivy stayed outside. Nelson let Sims and Bey into the apartment, where William Brown was also present. The group had drinks together in the kitchen. Nelson then gave Sims and Bey money to buy cigarettes and food.

Sims and Bey left the apartment together and joined Rodney Ivy outside. While Sims, Ivy, and Bey were walking around the area, Bey suggested that they buy knives instead of food. They went to a grocery store, where Bey bought a kitchen knife. As they walked back toward Nelson's apartment. Bey told Sims, "You do your part, and I'll do mine." Sims picked up a brick lying on the ground and put it in his coat pocket. When they arrived at Nelson's apartment, Rodney Ivy remained outside to stand watch.

Brown let Bey and Sims into Nelson's apartment, and Bey stabbed Brown near the front door. Sims went to the kitchen, where Nelson was seated at the kitchen table. Sims heard a commotion in the front of the apartment, and hit Nelson on the head several times with the brick. As Nelson fell to the ground and began moaning, Sims went to the bedroom to search for a gun that he knew was in the apartment.

While in the bedroom, Bey told Sims that Nelson was still alive and that he "would take care of him." Bey and Sims then took several items from the apartment, including the VCR, and left the apartment. Rodney Ivy, Sims, and Bey walked back to Josie Ivy's apartment.

When they arrived at Josie's apartment, Bey said that he had taken $20 from the victims and gave Sims $12. Bey also told Sims to take what he wanted from the group of items taken from the apartment. Sims took what he believed were two guns. Bey told him that he would sell the VCR later, and advised Sims to go home because he was "full of blood." After realizing that the guns were BB guns, Sims gave them to Rodney along with $2.

Vucko denied that he struck, kicked, or threatened Sims during his interrogation, and testified that Sims was given food and drink. He further stated that Sims did not ask to use the telephone or say he had been beaten.

### 4.     Robert Chapman Buckley, Jr.

Assistant State's Attorney Robert Chapman Buckley, Jr., testified about his conversations with Sims after Sims' arrest on December 21, 1988. Buckley stated that when he took the statement from Sims, he did not see any injury to Sims' face, head, eyes or mouth. Buckley then left the room, and wrote out the statement that Sims had given him, which described the events surrounding the murders in substantially the same fashion as the account Sims allegedly gave to Detective Vucko.

The statement prepared by Buckley included a section indicating that no one had promised Sims anything, or forced or threatened him in connection with the statement. In addition, the statement specified that the police and Assistant State's Attorney had treated Sims well, that Sims was not under the influence of alcohol or drugs, and Sims made the statement freely and voluntarily. Sims, Vucko, and Buckley reviewed Sims' statement together, and Sims signed the bottom of each page of the statement and the portion of the statement that set out his Miranda rights.

### 5.     Sims

#### a.     Sims' Testimony About His Confession

Sims took the stand at trial. He testified that he did general handyman work, such as plumbing and electrical repairs. Sims's brother introduced him to Nelson in 1987 or 1988. Sims stated that he had been at Nelson's apartment four times, but had never borrowed money from Nelson. According to Sims, the last time he was at Nelson's apartment was in the second or third week of November of 1988, when he worked on Nelson's plumbing and drank juice offered by Nelson.

In his trial testimony, Sims recanted his confession and testified that he signed the confession because the police had assaulted him during questioning. Specifically, Sims testified that on December 21, 1988, at approximately 11 p.m., Chicago police officers arrested him and took him to the police station. According to Sims, upon his arrival, he was placed in an interview room and handcuffed to a ring on the wall. After approximately 20 minutes, Detective Vucko entered the room and told Sims, "You are going to tell me about the sissies that were killed." Sims responded by saying he did not know anything about the murders. Vucko accused Sims of lying, stating that Josie Ivy "had told him."

Sims testified that after he again denied that he knew anything about the murders, Vucko repeatedly struck him in the face and continued to accuse him of being a liar. When Sims continued to deny any involvement in or knowledge of the murders, Vucko assaulted him, causing Sims to sustain injuries to his leg, ribs, mouth, face and eyes. According to Sims, Vucko then said, "We are going to do you like we did Tony Bey" and started "hollering" at Sims.

Vucko left the room and returned with a written statement that he had drafted. Vucko sat in front of Sims, read the statement (in which Sims confessed to the murders) , and asked Sims if it was correct. Sims answered yes because he was afraid that Vucko would continue to beat him if he did not agree.

Sims also testified that Assistant State's Attorney Buckley entered the room after he signed the confession provided by Vucko. Vucko again read the statement that he had prepared, and Sims again agreed that it was accurate. However, when Buckley gave Sims another written statement that he had prepared, Sims refused to sign it because "it wasn't true." Sims asked Buckley, "[I]f I don't sign it, would the police beat me anymore?" and Buckley responded, "[T]he best thing [I] can do is tell [you] to sign it." Sims testified that he then signed the

statement, because he was afraid the police would beat him again. Sims also testified that before he signed the statements, he was neither given any food or water nor advised him of his Miranda rights.

After Sims signed the statement prepared by Buckley, Sims was taken to the lockup, where he was allowed to use a phone. He called his sister, Eloise Cole, and told her that he had been beaten by the police and that they made him sign a statement.

Sims met with his attorney, Cook County Assistant Public Defender James Mullenix, on December 23, 1988. He told Mullenix that the police had beaten him while he was in custody. Pictures taken of Sims on that day show a swollen right cheek and eye area, bruised lip and bruised chest.

### b.    Sims' Version of Events

After Sims recanted his confession, he denied that he went to see Josie Ivy on the evening of the murders or that he went to Nelson's apartment with either Tony Bey or Rodney Ivy. Sims then denied any involvement in the double homicides at Nelson's apartment and denied offering to sell Lee Ivy a VCR, or telling his nephew, James Jackson, that he had killed two people.

### 6.    Eloise Cole

Eloise Cole, Sims' sister, testified that Sims came over to her house on November 23, 1988 (three days after the murders) and asked if her son, James Jackson, was at home. Cole denied that she told detectives, when they talked to her on November 30, 1998, that Sims also asked if the police were looking for him.

Cole also testified that Sims called her on the evening of December 22, 1988, and told her that the police had locked him up for murder, beaten him, and refused to take him to the doctor.

Cole testified that she went to court the following day and saw Sims. According to Cole, he looked "horrible" and appeared to be sick.

### 7. Detective Book

In the State's case in rebuttal, Detective Boock testified that he interviewed Cole on November 30, 1988. Boock asserted that Cole told him that on November 23, 1988, Sims arrived at her home and told her that the police might be looking for him. He also testified that Cole told him that when Sims left the house, her son, James, was with him.

### 8. Detective Vucko and Assistant State's Attorney Robert Chapman Buckley, Jr.

Detective Vucko and Assistant State's Attorney Robert Chapman Buckley, Jr. testified regarding their conversations with Sims at the police station on December 21, 1988. Both denied that Sims was forced to confess. Vucko denied striking or kicking Sims and asserted that Sims was given food and drink, was not handcuffed while he was in the interrogation room, and was read his Miranda rights. In addition, Vucko testified that Sims initially denied any involvement in the murders, but confessed after the police informed him that they had spoken to Tony Bey, Rodney Ivy, Josie Ivy, and James Jackson.

Buckley testified that Sims agreed to sign a written statement. Buckley thus wrote out a statement that Sims read and signed. The statement said, among other things, that no one promised him anything, forced him, or threatened him to make his statement and that the police and Buckley treated him well. Finally, Buckley testified that he did not see any injuries to Sims' face, head, eyes or mouth.

### 9. Howard Hradek

Howard Hradek, a paramedic supervisor at Cermak Hospital, testified that hospital records indicated that Sims spoke to hospital personnel on December 30, 1988, and complained of chest pains. The following day, Sims complained of rib pain. He never complained about injuries to his leg, face, mouth, or head.

### 10. Randall Williams

Randall Williams, victim Robert Nelson's son, testified at trial and was cross-examined about his criminal record, a history of drug use, and a stain found on his coat that was believed to be blood.

## II. Discussion

As noted above, Sims raises five issues: (1) he was arrested without probable cause; (2) he was denied due process of law when the trial court prevented him from telling the jury about all of the circumstances surrounding his allegedly coerced confession; (3) he was denied due process of law when the trial court declined to grant a mistrial; (4) he received ineffective assistance of counsel on direct appeal because his attorney failed to argue that his confession was involuntary and should have been suppressed; and (5) the State improperly relied on the coerced testimony of James Jackson. For the following reasons, Sims' first issue is not cognizable in a federal habeas corpus proceeding, issues two and three lack merit, and issues four and five are procedurally defaulted.

### A. Exhaustion and Procedural Default

Before addressing the merits, the court must consider the threshold issues of exhaustion and procedural default under Illinois law. *See Mahaffey v. Schomig*, 294 F.3d 907, 914-15 (7th

Cir. 2002). Because the respondent contends that claims four and five are procedurally defaulted, the court will work backwards and considering these claims first.

### 1. Exhaustion of State Court Remedies

To exhaust state court remedies, a petitioner must give the state courts an opportunity to act on each of his claims before he presents them to a federal court. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). State remedies are exhausted when they are presented to the state's highest court for a ruling on the merits or when no means of pursuing review remain available. *O'Sullivan v. Boerckel*, 526 U.S. at 844-45, 847; 28 U.S.C. § 2254(c). Here, it is undisputed that Sims has exhausted his state court remedies because no state court relief is available to him at this stage in the proceedings.

### 2. Procedural Default

Procedural default occurs when a petitioner fails to comply with state procedural rules. *Mahaffey v. Schomig*, 294 F.3d at 915. One way to procedurally default a claim is to fail to pursue all appeals required by state law. *See O'Sullivan v. Boerckel*, 526 U.S. at 844; *see also Castille v. Peoples*, 489 U.S. 346, 349 (1989). Thus, to avoid procedural default, all claims raised in Sims' § 2254 petition relating to issues raised on direct appeal (when Sims was subject to a sentence of death and thus was able to appeal directly to the Illinois Appellate Court) must appear in his filings with the state trial court and the Illinois Supreme Court.

Similarly, all claims relating to issues raised in his state post-conviction proceedings (after his sentence was commuted) must appear in his filings with the state trial court, the Illinois Appellate Court, and the Illinois Supreme Court. *See O'Sullivan v. Boerckel*, 526 U.S. at 844 (failure to present claim to state's highest court means that it is procedurally barred); *Guest v. McCann*, 474 F.3d 926, 930 (7th Cir. 2007) ("In Illinois, . . . a petitioner must have directly

appealed to the Illinois Appellate Court and presented the claim in a petition for leave to appeal to the Illinois Supreme Court"); *Lewis v. Sternes*, 390 F.3d 1019, 1025-26 (7th Cir. 2004) ("Fair presentment in turn requires the petitioner to assert his federal claim through one complete round of state-court review, either on direct appeal of his conviction or in post-conviction proceedings . . . . This means that the petitioner must raise the issue at each and every level in the state court system, including levels at which review is discretionary rather than mandatory").

This rule presents a problem for Sims, as two of the arguments in his § 2254 petition (claims four and five, which are his claims that he received ineffective assistance of counsel on direct appeal because his attorney failed to try to suppress his confession and that James Jackson's statement was coerced) did not appear in the PLA filed in his state post-conviction proceedings. This court may still reach the merits of a procedurally defaulted claim if the petitioner establishes either cause for his failure to follow a rule of state procedure and actual prejudice, or that the default will result in a fundamental miscarriage of justice. *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).

Cause exists where "some objective factor external to the defense impeded [the petitioner's] efforts to comply with the State's procedural rule." *Strickler v. Greene*, 527 U.S. 263, 282 (1999). Here, Sims failed to properly follow state procedural rules. His § 2254 petition includes the following explanation for his failure to file a PLA in his state post-conviction case:

> My attorney was afraid to jeopardize our success in obtaining a hearing on the Summerville count, which he thought was our strongest claim. He thought that our sentencing claims were moot in light of the commutation of my death sentence. He also thought, incorrectly, that he would be able to seek leave to appeal to the Illinois Supreme Court on all claims after the evidentiary hearing on the Summerville claim.

Pet. at 26.

Nothing in the record before the court indicates that an objective factor prevented Sims from raising all of his post-conviction claims in a timely-filed PLA. In addition, the Seventh Circuit has recognized that "the assertion of ineffective assistance as a cause to excuse a procedural default in a § 2254 petition is, itself, a constitutional claim that must have been raised before the state court or be procedurally defaulted." *Lee v. Davis*, 328 F.3d 896, 901 (7th Cir. 2003), *citing Edwards v. Carpenter*, 529 U.S. 446, 453 (2000). Sims did not raise this issue before the state court, so he cannot use it to preserve claims not raised in his PLA. Finally, an allegation of ineffective assistance of post-conviction counsel cannot establish prejudice because there is no right to counsel on collateral review. *See Anderson v. Cowan*, 227 F.3d 893, 901 (7th Cir. 2000), *citing Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991); *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987). Accordingly, Sims cannot establish cause and prejudice.

He also cannot establish that a fundamental miscarriage of justice will occur unless his default is excused. To be eligible for the fundamental miscarriage of justice exception to procedural default, Sims must present new and convincing evidence of his innocence by showing that it is more likely than not that no reasonable juror would convict him in light of that new evidence. *Schlup v. Delo*, 513 U.S. 298, 324 (1995). Sims has not attempted to satisfy this very demanding standard, and no evidence in the record as it currently stands indicates that he would be able to do so. The court, therefore, finds that claims four and five (ineffective assistance of counsel on direct appeal and his claim based on James Jackson's statement) are procedurally defaulted.

**B.** **The Merits of Sim's Non-Defaulted Claims**

**1.** **Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petitioner is not entitled to a writ of habeas corpus unless the challenged state court decision is either "contrary to" or "an unreasonable application of" clearly established federal law as determined by the United States Supreme Court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 404-05 (2000). In *Williams,* the Supreme Court explained that a state court's decision is "contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion opposite to that reached by the Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *See id.* at 405.

With respect to the "unreasonable application" prong under § 2254(d)(1), a habeas petitioner must demonstrate that although the state court identified the correct legal rule, it unreasonably applied the controlling law to the facts of the case. *See id.* at 407. A state court's application of Supreme Court precedent is unreasonable if the court's decision was "objectively" unreasonable. *See Lockyer v. Andrade,* 123 S.Ct. 1166, 1174 (2003) (unreasonable application more than incorrect or erroneous). In order to be considered unreasonable under this standard, a state court's decision must lie "well outside the boundaries of permissible differences of opinion." *See Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002); *see also Searcy v. Jaimet,* 332 F.3d 1081, 1089 (7th Cir. 2003) (decision need not be well reasoned or fully reasoned and is reasonable if one of several equally plausible outcomes); *Schultz v. Page,* 313 F.3d 1010, 1015 (7th Cir. 2002) (reasonable state court decision must be minimally consistent with facts and circumstances of the case).

## 2. Fourth Amendment – Sims' Arrest

Sims contends that his confession was the fruit of an unlawful warrantless arrest because the statements of his co-defendants, Rodney Ivy and Tony Bey, were unreliable and thus could not have established probable cause for his arrest. In support, Sims notes that Bey's statement was subsequently suppressed and both Ivy and Bey were found not guilty at a bench trial. He also argues that the police had sufficient time to obtain a warrant but failed to do so. He contends that the failure to obtain a warrant is a tacit admission that the police knew that any proffered basis for a warrant would be suspect. *See Pet*. at 13-15.

With respect to this issue, the Illinois Supreme Court held:

> Defendant argues that the police lacked probable cause to arrest him. The record shows that defendant, Tony Bey, and Rodney Ivy were jointly indicted for the offenses related to the deaths of Nelson and Brown. The trial court held various pretrial hearings with respect to motions filed by defendant, Tony Bey, and Rodney Ivy. The hearing on defendant's motion to quash his arrest was held concurrently with a hearing on Bey's motion to suppress his statements to authorities.

> At the end of these hearings, the trial court determined that the police had probable cause to arrest the defendant. The court noted that the statements made by Tony Bey and Rodney Ivy, both of which implicated the defendant, were sufficient to provide the police with probable cause to arrest the defendant. The court then considered Bey's motion to suppress his statements to authorities and concluded that Bey's statements were the product of police coercion and should be suppressed from Bey's trial for his participation in the double homicides.

> In light of the trial court's rulings with respect to the involuntariness and suppression of Bey's statements, defendant claims that the police did not have probable cause to arrest him for the homicides. Relying on *People v. Bates* (1991), 218 Ill.App.3d 288, 161 Ill.Dec. 113, 578 N.E.2d 240, defendant argues that the coerced statements of one participant to a felony cannot be used to establish probable cause to arrest a co-felon. Defendant also claims that the statement by Ivy could not form the basis for probable cause, inasmuch as Ivy was later acquitted in a separate bench trial.

It is well established that the police may arrest a person suspected of having committed a felony provided there is probable cause for the arrest. (*People v. Edwards* (1991), 144 Ill.2d 108, 127, 161 Ill.Dec. 788, 579 N.E.2d 336.) Probable cause is defined as reasonable ground to believe that the suspect has committed, or is committing, a felony. (*People v. Williams* (1991), 147 Ill.2d 173, 209, 167 Ill.Dec. 853, 588 N.E.2d 983; *People v. Montgomery* (1986), 112 Ill.2d 517, 525, 98 Ill.Dec. 353, 494 N.E.2d 475; *People v. Neal* (1985), 111 Ill.2d 180, 193, 95 Ill.Dec. 283, 489 N.E.2d 845; 725 ILCS 5/107-2 (West 1992).) Probable cause to arrest is a nontechnical concept determined according to the totality of the circumstances confronting the officers at the time of the arrest. *Edwards*, 144 Ill.2d at 128, 161 Ill.Dec. 788, 579 N.E.2d 336; *People v. Foskey* (1990), 136 Ill.2d 66, 76, 143 Ill.Dec. 257, 554 N.E.2d 192.

In determining whether the trial court correctly found probable cause to arrest the accused, a reviewing court is not limited to the evidence presented at the circuit court's pretrial suppression hearing, but may also consider evidence that was offered at the defendant's trial. (*People v. Patterson* (1992), 154 Ill.2d 414, 450, 182 Ill.Dec. 592, 610 N.E.2d 16; *People v. Melock* (1992), 149 Ill.2d 423, 433, 174 Ill.Dec. 857, 599 N.E.2d 941, *citing People v. Caballero* (1984), 102 Ill.2d 23, 36, 79 Ill.Dec. 625, 464 N.E.2d 223.) Also, this court may affirm a trial court's suppression ruling for any reason appearing in the record, regardless of whether such reason was expressly noted by the trial court in reaching its conclusion. *People v. Everette* (1990), 141 Ill.2d 147, 158-59, 152 Ill.Dec. 377, 565 N.E.2d 1295.

We need not address the defendant's argument that the police could not rely upon the statements of Tony Bey and Rodney Ivy in order to find probable cause to arrest defendant. In addition to the statements of Tony and Rodney, the police had additional information that justified defendant's arrest. Josie Ivy testified that prior to the defendant's arrest, she informed authorities of the defendant's statement to her regarding the double homicides. According to Josie's trial testimony, defendant said that he and Tony had killed two persons on November 22, 1988. He told Josie that he had hit a man and that Tony had stabbed a second individual. Defendant also told Josie that they had taken various items from the apartment, including a VCR.

In addition to Josie's statements to authorities, James Jackson, defendant's nephew, testified that on November 30, 1988, he advised officers that he had a conversation with the defendant a week earlier, on November 23. In this conversation, defendant told James that defendant believed the police were looking for him because he was in trouble and had been involved in a double homicide. Defendant said that the murders occurred in an apartment where his brother, James' uncle, used to live. Defendant related to James that one victim had been stabbed and another victim hit with a brick. Defendant said that he was afraid that his fingerprints would be found at the scene of the murders.

The defendant claims that Josie Ivy's statements were not reliable because she engaged in drug and alcohol use and because she was motivated to inculpate the defendant in order to exonerate her son, Rodney, who also was arrested in connection with the murders. Defendant also contends that James Jackson's statements were untrustworthy because James engaged in drug use that caused him to suffer from delusions and hallucinations for which he was undergoing medical treatment.

However, evidence at the scene of the murders corroborated the accounts given by James Jackson and Josie Ivy. When authorities entered Nelson's apartment, they discovered that both victims had been killed. One victim had been stabbed, while the other had been hit over the head with a blunt object. Investigation revealed that defendant's brother had once lived with Nelson. The authorities learned from victim Nelson's son that a VCR had been taken from the residence. We find that the statements to authorities that were given by Josie Ivy and James Jackson were sufficiently corroborated by the condition of the scene of the murders to render their statements reliable. In light of these circumstances, the record shows that the police had probable cause to arrest the defendant. As a result, the record supports the trial court's determination of probable cause, as well as the trial court's denial of defendant's motion to quash his arrest.

*People v. Sims*, 167 Ill.2d at 499-502.

The Illinois Supreme Court thus clearly ruled on the merits of Sims' Fourth Amendment claim and rejected it after conducting a detailed survey of the evidence supporting its ruling as to probable cause. Sims nevertheless asks this court to suppress his statement because it flowed from an improper, warrantless arrest. Unfortunately for Sims, this claim is not cognizable in a federal habeas corpus proceeding as over thirty years ago, the Supreme Court held that "federal courts hearing collateral attacks under § 2254 may not enforce the exclusionary rule unless the state judiciary denied the defendant a full and fair opportunity to contest the search or seizure." *Hayes v. Battaglia*, 403 F.3d 935, 939 (7th Cir. 2005), *citing Stone v. Powell*, 428 U.S. 465, 481-82 (1976).

The Seventh Circuit has repeatedly enforced this rule by rejecting efforts to review the merits of a state court's application of the exclusionary rule if a petitioner had the opportunity to

litigate his Fourth Amendment claim in state court. *See Ben-Yisrayl v. Buss*, 540 F.3d 542, 552 (7th Cir. 2008) (rejecting habeas petitioner's Fourth Amendment claim based on his argument that the state court failed to apply the relevant law to the facts because "[r]egardless of our own judgment [regarding the applicability of certain cases], [the petitioner] received a full and fair hearing on this issue, and we will not second-guess the Indiana Supreme Court's reasoning"); *Watson v. Hulick*, 481 F.3d 537, 542 (7th Cir. 2007) (rejecting Fourth Amendment claim raised in a § 2254 petition where the petitioner had an opportunity to present his Fourth Amendment claim to the Illinois courts); *Hayes v. Battaglia*, 403 F.3d at 939 ("[the petitioner] does not contend that Illinois withheld a full and fair opportunity to litigate his arguments based on the fourth amendment; he simply asks us to disagree with the state courts' decision, a path that *Stone* closes"); *Cabrera v. Hinsley*, 324 F.3d 527, 531-32 (7th Cir. 2003) (a "full and fair [hearing] guarantees the right to present one's case, but it does not guarantee a correct result" so "[a]bsent a subversion of the hearing process," federal courts cannot examine whether those courts "got the decision right"). Because Sims disagrees with the state court's ruling but has not shown that the state court deprived him of a full and fair opportunity to litigate his Fourth Amendment claim, habeas relief as to this claim is unavailable.

### 3. Due Process

Next, Sims argues that he was denied due process of law when the trial court did not permit him to testify about all of the circumstances that led him to confess to the murders despite his innocence, or to present arguments about an affidavit that Sims signed while he was in jail awaiting trial. *See* Pet. at 15-16.

### a.     Sims' Statements and Confession

Specifically, Sims first contends that the state court should have let him testify about his

state of mind and motive for his oral and written statements to the police and his state of mind

when he signed the confessions drafted by Vucko and Buckley.  Sims asserts that he made the

statements and signed the confessions because he was afraid the police would assault him again

and mistreat him like they had mistreated Tony Bey.

With respect to the statements and confession, the Illinois Supreme Court held that:

> Defendant contends that he should have been permitted to testify that he had made
> his inculpatory statements because the police threatened to beat him as they had
> beaten Tony Bey.

> Initially, we note that the record refutes defendant's claim that he was not
> permitted to testify to the statement he attributed to Detective Vucko in this
> regard.  The record reflects that on direct examination, defendant testified that
> Detective Vucko said to defendant, "We are going to do you like we did Tony
> Bey."  The prosecution objected to this comment.  At a sidebar outside the
> presence of the jury, the trial court overruled the State's objection to the
> defendant's statement as quoted above.

> During the sidebar, defense counsel additionally represented that he wanted to
> offer evidence of defendant's knowledge of the specific circumstances involving
> Tony Bey's interrogation.  Counsel stated that this additional testimony should be
> admissible to show defendant's state of mind, in that the defendant felt threatened
> by the officer.  The trial court sustained the prosecution's objection to such
> additional questioning of defendant regarding the circumstances surrounding the
> authorities' interrogation of Tony Bey.

> The trial court then resumed the proceeding in the presence of the jury.  Before
> examination of the defendant was resumed, the judge stated that the prosecutor's
> objection was sustained.  Defense counsel then recommenced its examination of
> the defendant.

> The defendant argues that the trial court sustained the prosecutor's objection to
> defendant's testimony that Detective Vucko said, "We are going to do you like we
> did Tony Bey."  However, in the context of the court's proceedings, it is apparent
> that the court's ruling, in which the court sustained the State's objection, pertained
> to the prosecutor's second objection to defense counsel's questioning of defendant
> regarding the specific details of police officers' beating of Tony Bey.  There is

nothing in the record to suggest that the court excluded from the jury's consideration defendant's testimony that Detective Vucko had threatened the defendant. Based upon our review of the record, we find that the trial court permitted the jury to consider defendant's testimony in this regard.

We further find no reversible error in the trial court's determination that defendant should not be permitted to testify to his understanding of the details surrounding the officers' mistreatment of Tony Bey. Even if we assume arguendo that the court's ruling was incorrect, the overwhelming evidence of the defendant's guilt renders such error an inadequate ground to warrant a new trial. The evidence in the present case revealed that defendant told at least two individuals, his nephew, James Jackson, and his girlfriend, Josie Ivy, that he had been involved in the murders of William Brown and Robert Nelson and gave specific details as to where, when and how the murders occurred. Information and evidence discovered by authorities corroborated the accounts given by defendant to James and Josie. For example, defendant's fingerprints were found at the scene of the crime. Defendant's brother had once lived in the apartment with Nelson, one of the victims. Items that were taken from the residence were traced to the defendant. Given all of this evidence, we do not believe that the defendant's testimony to the specific circumstances of Tony Bey's mistreatment by authorities would have altered the verdicts returned against the defendant by the jury in the instant cause.

*People v. Sims*, 167 Ill.2d at 502-04.

A defendant has a Sixth Amendment right to offer testimony in his own defense at trial.

*Taylor v. Illinois*, 484 U.S. 400, 409 (1988) (the right to offer testimony flows from the Sixth

Amendment and "is a fundamental element of due process of law"). Here, Sims does not argue

that the state court's ruling is contrary to controlling Supreme Court authority. The court thus

considers whether the state court's ruling is an unreasonable application of any controlling

Supreme Court authority.

The Illinois Supreme Court found that Sims was permitted to testify that Vucko told him

"We are going to do you like we did Tony Bey." This conclusion was based on its reading of the

state court record, which showed that the trial court sustained an objection to defense counsel's

questioning of Sims about the specific details of police officers' beating of Tony Bey. *See*

*People v. Sims*, 167 Ill.2d at 502-04.  This reading of the record is reasonable, so Sims' claim based on Vucko's alleged threat to treat Sims like Tony Bey fails.

Sims' claim that he was not permitted to explain why he made confessions and signed the statements is similarly not supported by the state court record.  The Illinois Supreme Court's summary of the facts reflects Sims' testimony (which the court reviewed, as it is part of the record provided by the respondent) about the alleged abuse at the police station. *Id*. at 496.  The abuse, according to Sims' testimony, included handcuffing him to a ring in the interview room, hitting Sims in the face, "hollering" at him, and then assaulting him and causing injuries to Sims' leg, ribs, eyes, mouth, face, and eyes. *See id*.; *see also* Respondent's Ex. W at pp. 1705-15 (trial transcript excerpts from Sims' direct examination addressing the alleged mistreatment by the police, the effect of this alleged mistreatment on his state of mind, and how this allegedly induced him to confess to the murders).  Given that Sims *was* in fact permitted to testify about these events, his due process claim is unavailing.

### b.    Sims' Affidavit

In the affidavit at issue, Sims stated that Josie Ivy and Edward Powell were at "the party at the time the deceased was supposedly killed."  The State argued that the affidavit was an admission by Sims that he was at Nelson's apartment on the night of the murders.  Sims challenged the trial court's ruling prohibiting his attorney from asking him questions at trial to show that he executed the affidavit because he feared Tony Bey.

The Illinois Supreme Court affirmed the trial court's evidentiary ruling, stating:

> Defendant also contends that he should have been allowed to testify that he signed an allegedly incriminating affidavit because Tony Bey forced him to do so.  The record indicates that while defendant was held in jail pending trial, he executed an affidavit wherein he stated that Josie Ivy and Edward Powell were at "the party at the time the deceased was supposedly killed."  Defendant now claims that his

attorney should have been permitted to ask him questions at trial to show that he executed the affidavit because he feared Tony Bey.

We need not reach the question of whether the trial court abused its discretion when it denied defense counsel's request to examine the defendant regarding his fear of Tony Bey as a reason for defendant's execution of the affidavit. As noted above, the overwhelming evidence of the defendant's guilt leads us to conclude that the trial court's ruling did not amount to reversible error.

*People v. Sims*, 167 Ill.2d at 504.

Thus, in short, the Illinois Supreme Court declined to address whether the trial court abused its discretion on redirect when it refused to allow Sims' attorney to question elicit testimony from Sims to the effect that he signed the affidavit because he was afraid of Tony Bey. Instead, it found that overwhelming evidence supports the jury's guilty verdict. Sims does not challenge this aspect of the Illinois Supreme Court's ruling or contend that excluding the proposed testimony about the reason he executed the affidavit is contrary to or an unreasonable application of controlling Supreme Court authority.

In any event, Sims conceded that his statements in the affidavit are true:

PETITIONER'S COUNSEL:    This affidavit the truth?

PETITIONER:    Yes.

Q.    You swear this is the truth?

A.    Yes.

Respondent's Ex. X at p. 1914 (trial transcript excerpts from Sims' redirect examination). Thus, the relevance of the proposed testimony is unclear. It is clear, however, that the Illinois Supreme Court's ruling regarding the jailhouse affidavit cannot support a grant of habeas relief under 28 U.S.C. § 2254(d)(1).

### 4.       Due Process – Mistrial

Sims contends that his due process rights were violated when the State failed to make timely disclosures regarding: (1) an alleged blood stain on a coat belonging to Randall Williams (victim Robert Nelson's son); (2) Randall Williams's history of criminal convictions and drug use; and (3) the existence of a hat found at the murder scene. *See* Pet. at 17-19. At trial, Sims was able to cross-examine Williams about the bloodstain and his past, but argues that the State's violation of Illinois's discovery rules in connection with these items was in bad faith and warranted a mistrial. *Id*. at 20-21. In his § 2254 petition, he does not couch this issue in terms of a constitutional violation, but the court will construe his pleadings as repeating the *Brady* challenge that he presented to the Illinois courts.

Under *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. Favorable evidence under *Brady* includes both exculpatory and impeachment evidence. *Kyles v. Whitley*, 514 U.S. 419, 433 (1995). With respect to whether evidence is material, a *Brady* claim can succeed only when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id*. 514 U.S. at 434-35 (to prevail, a petitioner must show a "reasonable probability of a different result").

However, "[d]elayed disclosure of evidence does not in and of itself constitute a *Brady* violation." *United States v. Dumeisi*, 424 F.3d 566, 578 (7th Cir. 2005). Thus, late disclosure of *Brady* material does not violate a defendant's due process rights "unless [he] is unable to make effective use of the evidence." *Bielanski v. County of Kane*, No. 07-1928, — F.3d —, 2008 WL

5245997, at *12 (7th Cir. Dec. 18, 2008) (collecting cases).  In addition, the Seventh Circuit has

recently observed that "[a] court may address delayed disclosure through remedial measures,

such as a continuance, without requiring a new trial."  *Id*.

### a. The Illinois Supreme Court's Rulings

With respect to Williams and the hat, the Illinois Supreme Court held that:

> Defendant contends that the State committed three discovery violations, revealed
> during the course of trial, for which the trial court should have granted the
> defendant's motion for a mistrial.  According to the defendant, the State's failure
> to produce the information before trial violated the directives of *Brady v.
> Maryland* (1963), 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215.

> In *Brady*, the Supreme Court held that a prosecutor violates the due process rights
> of the accused when the State, notwithstanding a specific defense request for
> production of evidence, fails to disclose evidence that is material to the suspect's
> guilt or innocence.  (*See also United States v. Agurs* (1976), 427 U.S. 97, 96 S.Ct.
> 2392, 49 L.Ed.2d 342; *California v. Trombetta* (1984), 467 U.S. 479, 104 S.Ct.
> 2528, 81 L.Ed.2d 413; *Arizona v. Youngblood* (1988), 488 U.S. 51, 109 S.Ct. 333,
> 102 L.Ed.2d 281.)  Evidence is material when it would tend to raise a reasonable
> doubt of the defendant's guilt.  The pertinent inquiry is not whether the evidence
> might have helped the defense, but whether it is reasonably likely that it would
> have affected the outcome of the case.  (*E.g., People v. Foggy* (1988), 121 Ill.2d
> 337, 354, 118 Ill.Dec. 18, 521 N.E.2d 86; *People v. Flores* (1989), 128 Ill.2d 66,
> 91-92, 131 Ill.Dec. 106, 538 N.E.2d 481.)  Applying these principles to the
> defendant's arguments in this case, we find that the State's alleged *Brady*
> violations did not pertain to material evidence that would have affected the
> outcome of defendant's trial.

> The first alleged discovery violation pertained to the criminal record and history
> of drug use of Randall Williams.  Randall, the son of victim Robert Nelson,
> testified on behalf of the State at defendant's trial.  The defendant learned during
> trial that Randall had a criminal record and a history of drug use.  Defense counsel
> complained to the circuit court that this evidence should have been produced by
> the State before trial began.  In response to this complaint, the prosecutors
> maintained that they were unaware of Randall's criminal background or use of
> narcotics.  Defense counsel was permitted to undertake a voir dire of Randall
> regarding these matters before Randall gave his cross-examination testimony
> before the jury.

> We need not decide whether the State violated the directives of *Brady* with
> respect to the evidence that Randall had a criminal background and a history of

drug use. Our review of the record demonstrates that the defendant was not so prejudiced that he should have been awarded a mistrial. The trial court ensured that the defense was provided ample opportunity to cross-examine Randall regarding these matters, thereby preserving the defendant's argument that Randall's testimony should be disbelieved because of this witness' extensive criminal background and history of drug abuse. There is nothing in the record to indicate that the defense would have questioned Randall differently, or presented different or additional argument to the jury, if the defendant had been made aware, prior to trial, of Randall's criminal record and history of drug abuse.

The defendant's second allegation of discovery violation involves the State's asserted failure to reveal the results of tests to determine whether a stain found on Randall's coat contained evidence of blood.

We find no reversible error with regard to the trial court's denial of defendant's mistrial motion based upon the State's lack of disclosure of the results of police testing of the stain found on Randall's coat. The record does not establish that the police lab test result regarding the stain was material to a determination of the defendant's guilt. According to the record, the lab result indicated that the stain on Randall's coat was not a blood stain. As noted, evidence is material "'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" (*People v. Olinger* (1986), 112 Ill.2d 324, 342, 97 Ill.Dec. 772, 493 N.E.2d 579, *quoting United States v. Bagley* (1985), 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494.) Based upon our review of the record, which reveals the overwhelming evidence against the defendant, we do not believe that the outcome of the defendant's trial would have been different if the defense had learned at an earlier date that the stain on Randall's coat did not contain blood.

The last instance of alleged discovery violation pertains to the hat found by authorities at Nelson's apartment when the homicides were discovered. Detective Boock testified that he recovered a hat near Nelson's body. The police were not able to ascertain who owned the hat. The detective testified that the hat was submitted for blood and hair/fiber testing. Although the defense had received a copy of the serology report, the hair/fiber test results were never received by the defendant.

The defendant argues that the State's failure to disclose lab results for the hair and fiber found on the hat recovered from the scene amounted to a violation of *Brady*. We find no reversible error. The record indicates that the prosecutors were unaware that there had been a microscopic examination of hair and fibers on the hat. The trial court suggested that the defense question the appropriate witnesses to reveal the State's failure to pursue this area of the investigation, but the defense declined this invitation. Samples were taken from the defendant and the Randall brothers in order to determine whether their hair matched the hair found on the

hat. However, the results of this testing are not contained in the record and therefore do not aid in the defendant's defense. In light of the substantial evidence of the defendant's guilt, as set forth in the record, we do not believe that a more timely disclosure of this information would have affected the outcome of the defendant's trial.

We also consider, and reject, defendant's claim that the prosecutors in the instant cause were acting in bad faith when they failed to disclose the matters challenged by the defendant. (*See Youngblood*, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281.) The trial court made specific remarks that bear directly on this issue. The court commented that it was "clear retrospectively that the State was clearly not prepared to proceed when they proceeded." The court "retract[ed]" its earlier suggestion that "there may have been something intentionally done by [the assistant State's Attorneys]." There is nothing in the record to contradict the trial court's ultimate determination with respect to its finding that the prosecutors here were not acting in bad faith.

Defendant argues that his prosecution violated principles of double jeopardy, relying upon the rule that double jeopardy concerns arise where the prosecution has engaged in intentional misconduct that provoked the defendant to request a mistrial. (*See, e.g., Oregon v. Kennedy* (1982), 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416; *see also People v. Ortiz* (1992), 151 Ill.2d 1, 175 Ill.Dec. 695, 600 N.E.2d 1153.) Defendant contends that the State's *Brady* violations were intentional and were designed to provoke defendant into requesting a mistrial. However, the record discloses that the State did not violate *Brady*. The trial court found that the prosecutors' actions did not, in any event, amount to intentional misconduct.

In light of these considerations, we find defendant's *Brady* arguments inadequate to justify a new trial.

*People v. Sims*, 167 Ill.2d at 507-11.

### b.    Williams

Sims challenges the trial court's rulings with respect to the alleged blood stain on Williams' coat and Williams' history of criminal convictions and drug use. Because the state court correctly identified *Brady* as the applicable legal standard, its rulings regarding Williams and the hat are not contrary to clearly established federal law as determined by the United States

Supreme Court. The court thus considers whether the state court unreasonably applied the standard in *Brady* to the facts of this case.

The court first considers the stain on Williams' coat, which was revealed at trial (out of the jury's presence) to be a substance other than blood. As stated by Sims, the defense "cross-examined Williams extensively . . . about this coat and the blood spot" and also "vigorously cross-examined" a detective about Williams' treatment as a suspect due to the coat. Pet. at 17-18. The detective also testified that he was not aware of the results of lab tests on the coat. However, out of the presence of the jury, the detective then recalled that the lab had determined that the stain was not blood. Upon learning about the lab results for the coat, the defense sought a mistrial, contending that this disclosure "basically blows our whole defense." Pet. at 18. The trial court precluded the prosecution from introducing any evidence showing that the stain was not blood.

The state court's rulings gave Sims the benefit of any discovery violation that may have occurred because Sims was allowed to cross-examine both Williams and the detective about the supposed blood stain even though the actual evidence showed that the stain was not blood. Any error thus clearly inured to Sims' benefit, as if he had known about the lab results any earlier, he would not have been able to pursue a line of questioning based on the assumption that the stain was blood. Therefore, as the state court found, there can be no prejudice. *See People v. Sims*, 167 Ill.2d at 508-09; *see also Bielanski v. County of Kane*, — F.3d —, 2008 WL 5245997, at *12 ("Because [the petitioner] did not suffer the harm that *Brady* aims to prevent, we therefore conclude there was no Brady violation here").

With respect to Williams' criminal record and history of drug abuse, the state court held that Sims again failed to show prejudice because "[t]here [was] nothing in the record to indicate

that the defense would have questioned Randall [Williams] differently, or presented different or additional argument to the jury, if the defendant had been made aware, prior to trial, of Randall's criminal record and history of drug abuse." *See id.* at 508. Sims argues generally that he would have proceeded differently if he knew about Williams' background earlier. However, he neither identifies any specific changes he would have made in the presentation of his case nor points to any additional testimony he was prevented from eliciting from Williams at trial. The court thus concludes that the state court's resolution of this issue is a reasonable application of *Brady. See Kyles v. Whitley*, 514 U.S. at 435 (rejecting claim based on undisclosed favorable evidence that could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

### c. The Hat

Sims' final argument relates to the hat found at Nelson's apartment near his body after the homicides were discovered. All parties received the results of serology tests conducted on the hat. However, Sims argues here, as he did before the state court, that the State's failure to disclose the results of hair and fiber lab tests on the hat violate *Brady*. The state court, as noted above, observed that no evidence showed that the prosecutors knew that hair and fiber tests had been conducted on the hat. It also suggested that the defense question witnesses as to the State's failure to follow up on the hair/fiber tests, but the defense declined to do so. The trial court also recessed for several weeks so lab tests could be conducted on hair samples taken from Sims, Randall Williams, and his brother, George Williams, to determine if these samples matched those taken from the hat. *See id.* at 509; *see also* Pet. at 19. The record, however, shows that the trial court believed that by the time of trial, the hat had been contaminated. Pet. at 20

Sims contends that his lack of knowledge about the hair and fiber tests on the hat prior to trial prevented him from properly preparing his case because he was unable to obtain clothing and hair from Williams to compare to the materials found on the hat when it was still fresh evidence. He also argues that had he known about the hat situation prior to trial (as well as the fact that the stain on Williams' coat was not blood), he might have focused his energies elsewhere.

Ultimately, however, the prosecution did not use evidence about the hat at trial. Moreover, no evidence indicates that if Sims had known about the hair/fiber tests on the hat any earlier (or, as discussed above, the results of testing of the stain on Williams' coat), the result would have been changed. Vague assertions that Sims would have done things differently had he been armed with this information prior to trial are not enough to show that the state court's application of *Brady* was unreasonable. This is especially true in light of the record as a whole, which contains ample and substantial support for the jury's verdict. *See United States v. Bagley*, 473 U.S. at 675 (the purpose of the *Brady* rule is "to ensure that a miscarriage of justice does not occur"). Thus, the failure to disclose the existence of hair/fiber tests on the hat prior to trial does not support a grant of habeas relief.

## III. Conclusion

For the above reasons, Sims' § 2254 petition [1-1] is denied. The clerk is directed to enter a Rule 58 judgment and terminate this case from the court's docket.

DATE: January 30, 2009

Blanche M. Manning
United States District Court Judge